IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| **LISA MICHELLE MENA,** § | | |
| **Individually and as Natural Parent and** § | | |
| **Next Friend of B.A.M., a minor,** § | | |
| **J.L.M.., a minor, and J.A.M., a minor,** § | | |
| **Statutory Death Beneficiaries of JOSE** § | | |
| **ALEJANDRO ORTIZ-CASTILLO,** § | | |
| **Deceased,** § | | |
| § | | |
|    Plaintiffs, § | | |
| § | | |
| v. § | EP-10-CV-282-KC | |
| § | | |
| **UNITED STATES OF AMERICA,** § | | |
| § | | |
|    **Defendant**. § | | |

## ORDER

On this day, the Court considered the above-captioned case. The events that lie at the center of this case are sad and unfortunate. Nevertheless, this case must be dismissed because Plaintiffs have not met their burden of proving that they are the biological children or heirs of the deceased, Jose Alejandro Ortiz-Castillo. Therefore, because the Court finds that Plaintiffs B.A.M., J.L.M., and J.A.M. do not have standing to bring either a wrongful death or survival claim under the Federal Tort Claims Act, the Court hereby orders that the case be **DISMISSED**.

### I. BACKGROUND

This case involves a fatal shooting that occurred near the border between the United States and Mexico in El Paso County, Texas. Pls.' First Am. Compl. ("Complaint") ¶ 6, ECF No. 6. Plaintiffs allege that on August 8, 2007, Border Patrol Agent Brian Ernest Ault, in the scope of his employment, shot and killed Jose Alejandro Ortiz-Castillo ("Ortiz-Castillo"), a citizen of Mexico. *Id*. ¶¶ 6-8. Based on these allegations, Lisa Michelle Mena ("Mena") and the

1

alleged natural children of Ortiz-Castillo, Plaintiffs B.A.M., J.L.M., and J.A.M. (together "Plaintiffs"), brought suit against the Defendant, the United States of America, under the Federal Tort Claims Act ("FTCA") for violating Texas's Wrongful Death and Survival statutes. *See id.* ¶¶ 9-10.

On July, 20, 2012, the government moved for summary judgment against Mena. Mot. Summ. J. Claims Lisa Michelle Mena, ECF No. 44. The government argued that undisputed facts indicated that Mena was never married to Ortiz-Castillo and therefore she did not have standing to bring an FTCA claim. *Id.* at 2-4. These facts included Mena's deposition testimony that she was never married to Ortiz-Castillo, Mena's passport application that indicated that she has never been married, and Mena's admission that a marriage license documenting a marriage to Ortiz-Castillo did not exist in either Mexico or the United States. Plaintiffs did not contest this motion. Resp. to Def.'s Mot. Summ. J. Claims Lisa Michelle Mena, ECF No. 45. On October 1, 2012, the Court granted the motion for summary judgment against Mena's claims. Order, ECF No. 46. Accordingly, the remaining plaintiffs in this case are the children: Plaintiffs B.A.M., J.L.M., and J.A.M.

Subsequently, on November 20, 2012, the government submitted its "Section 'C' Pre-Trial Submissions" ("Submission"), ECF No. 57. In the Submission, the government declined to stipulate that Plaintiffs B.A.M., J.L.M., and J.A.M. are the natural children of Ortiz-Castillo. Specifically, the government contended that "Plaintiffs must support this fact [of paternity] with clear and convincing evidence, and their only source of proof is Mena's testimony, and her testimony lacks credibility." Submission 4. Because of concerns about the standing of Plaintiffs to bring either a wrongful death or survival claim under the FTCA, the Court, on November 27, 2012, ordered the parties to provide supplemental briefing on the issue of standing. Order, ECF

No. 60. The parties timely filed briefs. *See* Def.'s Trial Br. on Standing, ECF No. 63; Brief in Compliance with Court's Order ("Pls.' Trial Br. on Standing"), ECF No. 64.

On November 30, 2012, trial commenced. On that day, the Court heard arguments exclusively on the issue of standing. To prove that Ortiz-Castillo was the father of Plaintiffs B.A.M., J.L.M., and J.A.M., Plaintiffs presented Mena's testimony about her relationship with Ortiz-Castillo, photographs of tattoos on Ortiz-Castillo's body that included the names of B.A.M., J.L.M., and J.A.M., and various records indicating that Plaintiffs B.A.M., J.L.M., and J.A.M. regularly used the surname of "Ortiz-Mena." *See* Tr. of Record ("Transcript") 1-38, *Mena et al. v. United States*, 10-cv-00282-KC (W.D. Tex. Nov. 30, 2012); Pls.' Ex. 29; Pls.' Exs. 46-52, 56-67.[1] The government rebutted this evidence by attacking the credibility of Mena, questioning her association with Ortiz-Castillo, and producing evidence of other tattoos on Ortiz-Castillo's body. *See* Tr. 38-70, Def.'s Exs. CV, DB, CR; Def.'s Ex. AR.

Mena testified that she first met Ortiz-Castillo in Juarez, Mexico, in 2000, when she was seventeen. Tr. 7. The following year, she moved in with Ortiz-Castillo, his sister, and his sister's daughter in a house in Juarez. *Id.* Mena testified that she and Ortiz-Castillo's first son, J.A.M. was born on December 4, 2003. *Id.* at 8. According to Mena, J.A.M. was named, in part, after Ortiz-Castillo. The next year, Mena testified that the couple had a daughter, named J.L.M., born on June 26, 2004. *Id.* at 10. According to Mena, J.L.M. was named, in part, after Ortiz-Castillo's mother. *See id*; Pls.' Ex. 57 (identifying the name of Ortiz-Castillo's mother). The subsequent year, Mena testified that the couple had a second son, named B.A.M., born on December 6, 2005. Tr. 9. Mena testified that he too was named, in part, for Ortiz-Castillo. *Id.*

Mena testified that from 2001, until Ortiz-Castillo's death in 2007, she and the children continuously lived with Ortiz-Castillo. *Id.* at 10, 31. She stated that she did not have sexual

---

[1] The Court cites to the most current draft of the transcript.

relations with another person during this time period. *Id*. at 16. While they were living together, Mena stated that Ortiz-Castillo called the children "mis chavitos," or "my children" in Spanish, and the children refered to him as "papi," or "daddy" in Spanish. *Id*. at 16. Ortiz-Castillo would also, according to Mena, take care of the children when they were sick, cook for them, and play with them in the park. *Id*. at 17-18. When asked if Ortiz-Castillo "ever act[ed] like these were not his children," Mena replied "No." *Id*. at 19.

Plaintiffs also produced photos of tattoos on Ortiz-Castillo's body. *See* Pls.' Ex. 29. Mena identified these tattoos. *See* Tr. 10-13. The first tattoo identified was a tattoo of a "Tweety" bird inscribed with the name "Liz" and "te amo," or "I love you" in Spanish, on Ortiz-Castillo's right leg. *Id*. at 11; Pls.' Ex. 29. Mena explained that this tattoo represented Ortiz-Castillo's affection for her. *See* Tr. 11. The second tattoo identified was a tattoo of J.A.M.'s middle name on Ortiz-Castillo's chest. *See* Tr. 12; Pls.' Ex. 29. The third tattoo identified, also on Ortiz-Castillo's chest, was a tattoo of J.L.M.'s first name. *See* Tr. 12; Pls.' Ex. 29. The fourth tattoo identified, located just below the previous two, was a tattoo of B.A.M.'s first name. *See* Tr. 12; Pls.' Ex. 29.

Finally, Plaintiffs offered a number of documents indicating that Plaintiffs B.A.M., J.L.M., and J.A.M. routinely used the surname of "Ortiz-Mena." First, Plaintiffs offered birth certificates, registered in 2011 and signed only by Mena, that assigned the children the surname of "Ortiz-Mena." *See* Pls.' Exs. 49-51. Mena explained that after the birth of each child, she attempted to register each certificate but was turned away each time because she lacked proper identification. *See* Tr. 13-16. In 2011, when she was able to obtain a United States Passport and Texas identification card, she registered the certificates. *See id*. at 14. On each of the certificates, Mena is listed as the mother, but no father is listed. *See* Pls.' Exs. 49-51. Second,

4

Plaintiffs offered into evidence their school records, school documents, and immunization cards. *See* Pls.' Ex. 52. All of these documents indicate that Plaintiffs B.A.M., J.L.M., and J.A.M. used the surname of "Ortiz-Mena." *See id*. Plaintiffs also introduced a photo showing a man, whom Mena identified as Ortiz-Castillo, holding a child, whom Mena identified as J.A.M. *See* Pls.' Ex. 56; Tr. 31. Mena testified that this photo is from August 2003, when J.A.M. was eight months old. *See* Tr. 31. Finally, Plaintiffs introduced a utility bill from 2011, sent to Ortiz-Castillo's mother, Juana Castillo, that bears the same address that is on the other records relating to the children. *See id*. at 31; Pl.'s Ex. 52, 57. Plaintiffs implied that this bill indicates that Mena and the children continue to reside at Ortiz-Castillo's home. *See* Tr. 30-31.

On cross-examination of Mena, the government attacked her credibility as a witness. First, the government introduced evidence that Mena was convicted of a felony, possession of marijuana, in Texas state court in 2011. *See* Def.'s Ex. CV. Second, the government introduced a claim form from this case, on which, in 2007, Mena indicated that her marital status was "WIDOW." *See* Def.'s Ex. A. When asked if she understood, at the time she made out the claim form, that the definition of widow required her to be the "spouse [of Ortiz-Castillo] at the time of his death," Mena responded "Yes, sir." Tr. 40. Mena later equivocated, and was then asked if "[t]he definition of spouse is one who is married to another. Is that your understanding of the definition?" *See id*. at 40-41. She again answered in the affirmative. *Id*. Third, the government introduced a Untied States passport application that Mena had signed in 2011. *See* Defs.' Ex. DB. On that application, Mena checked a box indicating that she had never been married. *See id*; Tr. 42-43.

Following this, the government questioned Mena about her previous involvement in alien smuggling. Mena admitted that from age fourteen to sixteen, she helped aliens cross into the

United States illegally. *See id*. at 44. Mena further admitted that on occasions when the Border Patrol detained her, she would provide a fake name, false information regarding her citizenship, and an incorrect birthday. *Id*. at 44-46. Mena estimated that the Border Patrol detained her on twenty different occasions. *Id*. at 57. On one occasion, either in 1998 or 2000, it appears that Mena was detained, in the United States, and during the judicial process, lied about her citizenship, birthday, and name. *See id*. at 47-56. Mena stated that she lied about her identity in order to avoid prosecution and ensure that she was returned to Mexico. *See id*. at 58. Mena also admitted that, on one occasion, she bribed a Border Patrol agent to allow aliens she was smuggling to cross the border. *Id*.

Next, the government questioned Mena about her association with Ortiz-Castillo. Mena admitted that she and Ortiz-Castillo had been apart two times between 2001 and 2007. *See id*. at 59-60, 65. Mena indicated that she and Ortiz-Castillo first separated for one or two months, around August of 2003, when Ortiz-Castillo was arrested for selling drugs. *Id*. at 59-60. The two were also separated, a second time, at some time in 2004, when Ortiz-Castillo was detained in the United States for one month and convicted of illegal entry. *Id*. at 65.

The government then proceeded to inquire about a number of Mena's friends. First the government asked about a friend named Ramon, whose name Mena admitted to having tattooed on her body. *Id*. at 62. Mena stated that he was a "friend" who "passed away . . . a long time ago." *Id*. Next, the government asked about a man named Rodney, whom Mena admitted, had paid her monthly rent. *Id*. at 63. There was a dispute as to when Rodney started to pay the rent. Mena first stated that Rodney started to pay her rent in 2008. *See id*. But, when the government reminded Mena, that at her deposition, she had stated that Rodney had started to pay her rent in

2006, she agreed that he had started to pay her rent at the earlier time. *See id*. 63-65. It is unclear if Rodney still continues to pay Mena's rent.

Finally, the government produced its own photo of a tattoo on Ortiz-Castillo's body. This tattoo was of the name "Miriam" and was on Ortiz-Castillo's neck. *See* Def.'s Ex. AR. When asked who Miriam was, Mena stated that she was a girlfriend of Ortiz-Castillo. Tr. 65. It is unclear how long Ortiz-Castillo had the tattoo before Mena discovered it. The government stated that, at her deposition, Mena claimed that the tattoo had been on Ortiz-Castillo for "some time" before she saw it. *Id*. at 68. But on the witness stand, Mena did not recall making that statement and instead insisted that she learned about the tattoo after someone told her Ortiz-Castillo was seeing another person. *Id*. at 69. Only after she heard that Ortiz-Castillo was seeing another person did Mena, according to her testimony, see the tattoo on Ortiz-Castillo. *Id*. After seeing the tattoo when Ortiz-Castillo was showering, Mena confronted him about the relationship, which he admitted to. *Id*. These events seem to have occurred in 2005, when Mena was pregnant with B.A.M. *See id*. at 67, 69.

On redirect-examination of Mena, Plaintiffs attempted to rehabilitate Mena's character. Plaintiffs elicited testimony about Mena's difficult childhood. *See id*. at 70-74. Plaintiffs also inquired about Mena's friend, Ramon. *Id*. at 74. When asked if Ramon were still alive, Mena responded, "I don't know, ma'am." *Id*.

In closing arguments, both sides emphasized the burden of clear and convincing evidence needed to prove biological paternity in a wrongful death suit. Plaintiffs argued that Mena's testimony, the tattoos, and the records met this threshold. *See id*. at 75-78. The government argued that all the evidence offered was derived from Mena, a witness who, in the government's opinion, was not credible. *See id*. at 78-80.

## II. ANALYSIS

### A. Standard

A valid FTCA claim exists when the negligence of a federal government employee causes certain harms that would be actionable, under state law, if a private citizen committed them. *See Johnston v. United States*, 85 F.3d 217, 219 (5th Cir. 1996) (citing *Quinton v. United States*, 304 F.2d 234, 235 (5th Cir.1962)); *United States v. Olson*, 546 U.S. 43, 44, (2005). Accordingly, a court addresses the sufficiency of the underlying tort claim under state law. *Johnston*, 85 F.3d at 219 ("While substantive state law determines whether a cause of action exists, federal law determines when that claim accrues.").

#### 1. Wrongful death

Under Texas state law, the biological children of a deceased parent have standing to bring a wrongful death claim. *Pluet v. Frasier*, 355 F.3d 381, 384 (5th Cir. 2004) (citing Tex. Civ. Prac. & Rem. Code Ann. § 71.004(a)). As the parties correctly noted in their briefings, this biological link must be proven by clear and convincing evidence. *Id.* (citing *Garza v. Maverick Mkt., Inc.*, 768 S.W.2d 273, 275-76 (Tex. 1989)). Clear and convincing evidence, is evidence that "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of allegations sought to be established." *Tipps v. Metro. Life Ins. Co.*, 768 F. Supp. 577, 579 (S.D. Tex. 1991). This evidentiary standard "requires a greater degree of proof than the 'preponderance' standard, but less than proof 'beyond a reasonable doubt' as required in criminal proceedings." *Id.* at 579. In *Garza*, the Supreme Court of Texas noted that blood tests, physical resemblance, prior statements by the purported father, and periods of conception and gestation are all evidence that a trier of fact may look to in determining if there is a biological link. 768

S.W.2d at 276. But at the same time, the Supreme Court of Texas cautioned that what is clear and convincing evidence of a biological link depends on the facts of the case at hand. *See id*.

### 2. Survival

Under Texas state law, children need not prove a biological link to bring a survival action on behalf of the deceased parent's estate. *Pluet*, 355 F.3d at 384. Children need only prove that they are heirs to their parent's estate to have standing to bring a survival claim.[2] *See id*. Under Texas Probate Code section 42(b), a child can prove heirship to a purported father by either showing by clear and convincing evidence that the purported father is the biological father or by showing a father-child relationship.[3] *See* Tex. Prob. Code Ann. § 42(b). The Texas Family Code provides five ways to show a father-child relationship. *See* Tex. Fam. Code Ann. § 160.201(b). The first and only applicable way, in this case, to establish a father-child relationship is by establishing a statutory presumption of paternity. *See id*. Texas Family Code section 160.204 provides five ways a child can raise a statutory presumption of paternity. Tex. Fam. Code Ann. § 160.204. The first four ways are inapplicable in this case because they require the existence of a marriage, but the fifth allows for a presumption of paternity if "during the first two years of the child's life, [the father] continuously resided in the household in which the child resided and he represented to others that the child was his own." *Id*. But, to raise this presumption, a court must find that it is applicable to the facts of the case by a preponderance of

---

[2] In addition to standing to bring a survival claim, an heir must have capacity to bring a survival claim. *See Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 848-53 (Tex. 2005). In its brief to the Court, the government phrases its challenge to Plaintiffs' survival claim in terms of a lack of capacity. *See* Def.'s Trial Br. on Standing 3. Whether the government's challenge to Plaintiffs is a standing or capacity challenge is of no moment because both standing and capacity are required to bring a survival claim. *See Lovato*, 171 S.W.3d at 849.

[3] In their brief to the Court, Plaintiffs note that a survival action requires clear and convincing evidence of biological paternity. *See* Pls.' Trial Br. on Standing 4. They do not argue that it can also be demonstrated by a father-child relationship. *See id*. Rather, it is the government who correctly raises this point. *See* Def.'s Trial Br. on Standing 3.

the evidence.  *See* Tex. Fam. Code Ann. § 105.005 ("Except as otherwise provided by this title, the court's findings shall be based on a preponderance of the evidence.").  A preponderance of the evidence standard requires a court to look at "all circumstances raised by the evidence" and determine which theory of the case "is more reasonably probable than not."  *See Valles v. State*, 646 S.W.2d 636, 638 (Tex. App. 1983).  However, the presumption of paternity can be overcome by clear and convincing evidence to the contrary.  *Tipps*, 768 F. Supp. at 579.

Finally, this Court notes that in *Pluet*, the United States Court of Appeals for the Fifth Circuit considered both paternity and heirship to be questions of standing for wrongful death and survival claims under Texas law.  *See* 355 F.3d at 384-86; *Aguillard v. McGowen*, 207 F.3d 226, 231 (5th Cir. 2000) (framing the issue in terms of standing to bring a Texas survival claim via 42 U.S.C. § 1983).  This Court follows the Fifth Circuit's construction of the law.  However, this Court is aware that proof of paternity and heirship could be construed as elements of their respective torts.  But, in this case, the result does not change—whether Plaintiffs have failed to prove standing or an essential element—their claims are insufficient.

### B. Analysis

#### 1. Wrongful death claim

Because Plaintiffs' evidence of biological paternity is not clear and convincing, the Court finds that Plaintiffs do not have standing to bring an FTCA claim based upon the Texas wrongful death statute.  As noted above, Plaintiffs provide three types of evidence of biological paternity: Mena's testimony about her relationship with Ortiz-Castillo, photographic evidence of tattoos on Ortiz-Castillo's body, and various documents and records.  Tr. 1-32; Pls.' Ex. 29; Pls.' Exs. 46-52, 56-67.  Taken together, the Court is not persuaded that these pieces of evidence are clear and

convincing proof that Ortiz-Castillo was the biological father of Plaintiffs B.A.M., J.L.M., and J.A.M.

Because of the government's impeachment of Mena, the Court does not assign a high probative value to her testimony. On cross-examination, the government provided persuasive evidence that Mena has been untruthful about the nature of her relationship with Ortiz-Castillo. Specifically, the government provided evidence indicating that Mena has provided inconsistent statements about her marital status: in 2007, when she noted her marital status was "WIDOW" on a claim form, and in 2011, when she noted that she had never been married on a passport application. *See* Def.'s Exs. A, DB; Tr. 40-41, 42-43. It is possible that Mena was confused by the definition of "WIDOW" on the claim form in 2007. But one cannot be a widow, under any plausible definition of the word, if one was not married. Moreover, Mena's 2011 statement, on her passport application, of having never been married is in direct contradiction to her 2010 statement, in the complaint in this case, of being married to Ortiz-Castillo. *See* Def.'s Exs. A, DB; Tr. 40-41, 42-43; Compl. ¶ 1 ("[Plaintiffs B.A.M., J.L.M., J.A.M., and Mena] are the natural children and *spouse* of Jose Alejandro Ortiz-Castillo, [d]eceased.") (emphasis added).

This pattern of fabricating biographical information is consistent with Mena's own testimony that she would, when working as a smuggler, provide a false name, claim of citizenship, and birthdate to Border Patrol agents. Tr. 44-46. While Mena appears to have stopped smuggling aliens over a decade ago, she has admitted that she often provided false information to government officials and even once bribed a government official. *See id.* at 44, 57-58. Tellingly, Mena revealed that she made these fabrications in order to avoid unfavorable legal outcomes. *See id.* at 58. Mena's recent inconsistent representations about her relationship with Ortiz-Castillo—on the claim form, passport form, and the complaint in this case—and

felony conviction, last year in Texas state court, suggest that her pattern of behavior has not dramatically changed. *See* Def.'s Ex. CV.

The probative value of Mena's testimony is diminished because her statements were incomplete and unresponsive. For example, Mena originally testified that she moved into Ortiz-Castillo's house with Ortiz-Castillo, his sister, and his sister's daughter in 2001. Tr. 7. But later, Mena testified and evidence suggested that she was living at the same address with Ortiz-Castillo's mother in 2011. *See* Pls.' Ex. 57 (utility bill sent to Ortiz Castillo's mother); Tr. 31. While these two statements are not mutually inconsistent, they are also not congruent. The Court is left guessing if and when Ortiz-Castillo's sister moved out and if and when his mother moved in.

In addition to being incomplete in her testimony, Mena was often unresponsive in her answers to questions. At one point, Mena was asked, on cross-examination, if it was her testimony that Ortiz-Castillo "had this tattoo [of the name Miriam] on him for some time before [she] ever saw it?" Tr. 68. Mena responded "[n]o, sir," and was then asked if she thought she saw the tattoo on the day Ortiz-Castillo got it. *Id*. She responded "no." *Id*. More troubling, Mena's testimony often contradicted itself. For example, on direct-examination, Mena testified that she had lived continuously with Ortiz-Castillo from 2001 to 2007. Tr. 10, 31. But on cross-examination, Mena testified that she had been separated from Ortiz-Castillo twice during that time period: once in 2003 when Ortiz-Castillo was arrested for selling drugs and again in 2004, when Ortiz-Castillo was detained in the United States for an immigration violation. *Id*. at 59-60, 65. Similarly, Mena testified, on cross-examination, that her friend, Ramon, had previously died, but on redirect-examination, Mena stated that she did not know whether Ramon was alive or dead. *See id*. at 63, 74. These and other irregularities—such as when Mena's friend, Rodney,

began paying the rent—leave the Court with doubts about the veracity and completeness of her testimony. *See id.* at 63-65.

Nor is the evidence that Ortiz-Castillo tattooed the names of B.A.M., J.L.M., and J.A.M. on his body highly probative of biological paternity. In their summary of the case, Plaintiffs argued that these tattoos were Ortiz-Castillo's way of "recognizing [his] children, honoring his own children." *Id.* at 77. The court believes the tattoos to demonstrate a special connection with the children. However, these tattoos do little to show that Ortiz-Castillo was the *biological* father.

Finally, the documentary evidence that Plaintiffs provide is of low probative value. These records show that Plaintiffs B.A.M., J.L.M., and J.A.M. continually used the surname of "Ortiz-Mena." *See* Pls.' Exs. 46-52, 56-67. But, use of a surname name gives little proof of *biological* paternity. Plaintiffs B.A.M., J.L.M., and J.A.M. may have simply adopted part of Ortiz-Castillo's surname as a man in their household. Additionally, Mena's testimony suggests that she was the person who provided the biographical information in the immunization records that Plaintiffs offered into evidence. *See* Pls.' Ex. 52 (immunization records); Tr. 17 ("And if I needed to go to the clinic and [get the children] shots, some shots, [Ortiz-Castillo] will be taking care of the other ones."). Finally, the picture of Ortiz-Castillo holding J.A.M. is of low probative value because it does not indicate that Ortiz-Castillo is the *biological* father.

Simply put, the evidence provided does not clearly and convincingly prove that Ortiz-Castillo is the biological father of Plaintiffs B.A.M., J.L.M., and J.A.M. The primary evidence offered was the testimony of Mena, a witness with serious credibility issues. Plaintiffs offer no other testimony to corroborate Mena's testimony. The tattoos are not very probative of biological paternity. Nor is the documentary evidence of significant probative value, and much

of it is derived from Mena, herself. The Court cannot firmly believe that Ortiz-Castillo is the biological father of Plaintiffs B.A.M., J.L.M., and J.A.M. *See Tipps*, 768 F. Supp. at 579. As such, Plaintiffs have not met their burden. *See Pluet*, 355 F.3d at 384; *Garza*, 768 S.W.2d at 275-76.

### 2. Survival claim

Before discussing the merits of Plaintiffs' survival claim, the Court notes that neither party addressed this matter at trial. Both parties were aware of this issue and provided supplemental briefing on the legal contours of a survival claim. *See* Def.'s Trial Br. on Standing 2-3; Pls.' Trial Br. on Standing 4. Still, neither party addressed the issue at trial. Rather the parties solely focused their attention on the evidence required to show biological paternity for a wrongful death claim. As such, the Court has heard no explanation from the parties as to whether this evidence is sufficient to support a survival claim.

Because Plaintiffs cannot either (1) prove, by clear and convincing evidence, that Ortiz-Castillo is their biological father or (2) show, by a preponderance of the evidence, a father-child relationship, they do not have standing to bring a survival claim on behalf of Ortiz-Castillo's estate. *See* Tex. Prob. Code Ann. § 42(b); Tex. Fam. Code Ann. § 160.204.

For the same reasons discussed above with respect to the wrongful death claim, the Court finds that Plaintiffs have not proved biological paternity by clear and convincing evidence.

The Court is also not persuaded that Plaintiffs have presented sufficient evidence of a father-child relationship. The only applicable, and proposed, means of showing a father-child relationship, in this case, is by showing that "during the first two years of the child's life, [the father] continuously resided in the household in which the child resided and he represented to others that the child was his own." *See* Def.'s Trial Br. on Standing 3 (citing Tex. Fam. Code

14

Ann. § 160.204(a)(5)). Because it is undisputed that B.A.M. was born on December 6, 2005, less than two years before Ortiz-Castillo's death on August 8, 2007, the Court finds that it is not possible that for the first two years of Plaintiff B.A.M.'s life that Ortiz-Castillo resided in the same household. *See* Pls.' Ex. 51. Therefore, B.A.M. does not have standing to bring a survival claim.

Plaintiffs J.L.M. and J.A.M. have not demonstrated, by a preponderance of the evidence, that they are entitled to a presumption of paternity because it is uncertain that Ortiz-Castillo continuously resided in the household in which J.L.M. and J.A.M. resided for the first two years of their lives. *See* Tex. Fam. Code Ann. § 160.204. No credible evidence has been offered to show that Ortiz-Castillo ever resided in the same household as Plaintiffs J.L.M. and J.A.M. The only evidence suggesting that Ortiz-Castillo continuously lived with Plaintiffs J.L.M. and J.A.M. is Mena's testimony. *See* Tr. 10, 31. But for reasons outlined above, this Court finds this testimony unpersuasive. Nor is the remaining evidence persuasive. The medical records that Plaintiffs provided include an address and indicate that Plaintiffs lived in a house in Juarez. *See* Pls.' Ex. 52. This is the same address that is on a utility bill that was sent to Juana Castillo, purportedly Ortiz-Castillo's mother. *See* Pls.' Ex. 57; Tr. 31. And this is same address Mena listed on her 2007 claim form. *See* Def.'s Ex. A. This evidence implies that Plaintiffs J.L.M. and J.A.M., Mena, and Ortiz-Castillo's mother resided in the same household. But it does not suggest that Ortiz-Castillo lived there. He may have lived, temporarily or permanently, at a different residence. And even if Ortiz-Castillo lived in the same residence as Plaintiffs J.L.M. and J.A.M., no credible evidence has been offered to demonstrate that he did so continuously during the first two years of Plaintiffs J.L.M. and J.A.M.'s lives.

The Court is also unconvinced that Plaintiffs J.L.M. and J.A.M. have demonstrated, by a preponderance of the evidence, that they are entitled to a presumption of paternity because the evidence does not support that Ortiz-Castillo represented to others that J.L.M. and J.A.M. were his children. *See* Tex. Fam. Code Ann. § 160.204. The representation requirement is contained in Texas's Uniform Parentage Act ("UPA"). *See generally id*. § 160.101. Texas's UPA is based on the Uniform Law Commission's Parentage Act. *See* Parentage Act, *http://uniformlaws.org/Act.aspx?title=Parentage%20Act* (last visited Dec. 3, 2012). Accordingly, the Texas UPA specifically states that the law is to be "construed to promote the uniformity of the law among the states that enact the [UPA]." Tex. Fam. Code Ann. § 160.001. This Court's research indicates that Texas courts have not discussed what it means to "represent" a child as one's own under the Texas UPA. However, courts in other states, that have adopted the UPA, have discussed the matter.[4] *See, e.g.*, *Ex parte T.J.*, 74 So. 3d 447, 450-51 (Ala. Civ. App. 2011). Therefore, this Court looks to courts outside of Texas for guidance in construing the Texas UPA. *See* Tex. Fam. Code Ann. § 160.001.

The evidence required to show representation is case-specific. *See, e.g.*, *Chatterjee v. King*, 280 P.3d 283, 286 (N.M. 2012) ("We agree that a case-by-case analysis is the best way to determine whether an action is appropriate under the UPA."). The amount of evidence required to prove representation is substantial. *See, e.g.*, *In re K.M.*, F054935, 2008 WL 4060995, at *3 (Cal. Ct. App. Sept. 3, 2008) (looking to factors such as a purported father's presence on the birth certificate, providing a home, providing economic support, and establishing a relationship with the child). In this case, evidence that Ortiz-Castillo represented Plaintiffs J.L.M. and J.A.M. as his children is scarce. The only evidence of this is Mena's testimony about Ortiz-Castillo's

---

[4] Some UPA statutes use the term "hold out," instead of the term "represent," found in the Texas UPA. *Compare* Wyo. Stat. Ann. § 14-2-504 (West 2003), *with* Tex. Fam. Code Ann. § 160.204.

16

relationship with the children, which this Court does not find persuasive.  *See* Tr. 16-19.  And even that testimony was limited in its scope.  *See id*.  None of the other evidence contains any representations by Ortiz-Castillo regarding the children.

Based on the evidence presented, this Court finds that Plaintiffs B.A.M., J.L.M., and J.A.M. have not demonstrated that they have standing to bring a survival claim.  This is because they have neither demonstrated, by clear and convincing evidence, that they are the biological children of Ortiz-Castillo nor, by a preponderance of the evidence, that they had a father-child relationship with him.  *See* Tex. Prob. Code Ann. § 42(b); Tex. Fam. Code Ann. § 160.204.

### C. Applicability of *Garza*

Finally, the Court addresses Plaintiffs' argument that the *Garza* case is dispositive here.  Specifically, Plaintiffs argued, in closing, that in the *Garza* case there was less evidence of paternity, than in this case.  Tr. 75-77.  Because the evidence in *Garza* was sufficient to deny a directed verdict, Plaintiffs argued that the evidence in this case cannot support a directed verdict.  *See id*. at 76.  This argument is not relevant to this case, because *Garza* court held that a directed verdict was not appropriate and thus the case should proceed to a trier of fact.  *See Garza*, 768 S.W.2d at 276.  In this case, this Court is conducting a bench trial and acting as the finder of fact.  This court is making conclusions of fact, not law.

### III. CONCLUSION

For the reasons discussed above, the Court finds that Plaintiffs have not met their burden of showing that they have standing to bring their claims. Therefore, the Court **ORDERS** that the case be **DISMISSED**.

The Clerk shall **CLOSE** the case.

**SO ORDERED**.

SIGNED this 5th day of December, 2012.

                                        KATHLEEN CARDONE
                                        UNITED STATES DISTRICT JUDGE